B. P. BAILEY AND MRS. B. P. BAILEY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 33724, 33725. Promulgated November 9, 1929.

*H. B. Thomas, Esq.*, and *Thomas B. Love, Esq.*, for the petitioners. *Frank S. Easby-Smith, Esq.*, and *R. B. Cannon, Esq.*, for the respondent.

OPINION.

LITTLETON: The question presented here is whether or not the sale of Bailey's half interest in the partnership of Bailey and Collins was an installment sale under section 212 (d) of the Revenue Act of 1926. In order to determine this question it is first necessary to determine in what taxable period or year the sale was made, and, second, whether or not the payments during that year or taxable period exceed one-fourth of the purchase price.

Three requisites are necessary to constitute or create a simple contract such as the one here involved, viz., (1) parties having legal capacity; (2) mutual assent to its terms, and (3) an agreed valid consideration. There is no doubt of the first and third requirements. and none as to the second except as to the time it occurred.

In *Ide* v. *Leiser*, 24 Pac. 695; 10 Mont. 5, will be found an interesting and instructive opinion on (1) a sale of lands; (2) an agreement to sell lands; and (3) what is popularly called an "option." There, an option had been given supported by no consideration. The court held that it had no validity as an option, but was good as an offer to sell and a valid contract resulted if accepted before withdrawal. After discussing the various kinds of sales, offers, and options, the court said in part:

Examine the two options granted in the case before us. L. sold I. an option for 10 days from September 24th for one dollar. He then gives an option for another 10 days from October 3d, for what? For nothing. L. transfers this option, this incorporeal valuable something, for nothing. The transfer of the option was *nudum pactum*, and void. But, the point just discussed being conceded, appellant still contends that this second instrument or option was a continuing offer to sell, at a given price, and was accepted by the respondent before retracted, and that such acceptance, evidenced by, and accompanied with, the tender of the price, and demand for a deed, constitute an agreement to sell land, which may be enforced in equity. We leave behind now our views of options, and consideration therefor, and meet a wholly different proposition.

Reading the two instruments together we find that on October 3d L. extended to I. an offer to sell his lands at the price of $1,000. There was no consideration for the offer, and it could have been nullified by L. at any time by withdrawal. But it was accepted by I., while outstanding, the price tendered, and deed demanded. It must be plain from the previous discussion that we do not hold the offer, when made, or at any moment before acceptance, was a sale of lands, an agreement to sell lands, or an option. But upon acceptance and tender was not a contract completed? If one person offers to another to sell his property for a named price, and while the offer is unretracted the other accepts, tenders the money, and demands the property, that is a sale. The proposition is elementary. The property belongs to the vendee, and the money to the vendor. Such is precisely the situation of the parties herein. L. offered to sell for $1,000, I. accepted, tendered the price, and demanded the property. Every element of a contract was present, parties, subject-matter, consideration, meeting of the minds, and mutuality. And as to the matter of mutuality we are now beyond the defective option. We have simply an offer at a price, acceptance, payment or tender, and demand. That this was a valid contract we cannot for a moment doubt. In discussing a transaction of this nature, in *Gordon* v. *Darnell*, 5 Colo. 304, BECK, C. J., in one of his clear opinions, says: "Its legal effect is that of a continuing offer to sell, which is capable of being converted into a valid contract by a tender of the purchase money, or performance of its conditions, whatever they may be, within the time stated, and before the seller withdraws the offer to sell," LURTON, Jr., in *Bradford* v. *Foster*, 87 Tenn. 8, 9 S. W. Rep. 195, says: "Before acceptance, such an agreement can be regarded only as an offer in writing to sell upon specified terms the lands referred to. Such an offer, if based upon no consideration, could be withdrawn by the seller at any time before acceptance. It is the acceptance while outstanding which gives an option, not given upon a consideration, vitality." In *Railroad Co.*

v. *Bartlett*, 3 Cush., 227, we find the following, by FLETCHER, J.: "In the present case, though the writing signed by the defendants was but an offer, and an offer that might be revoked, yet while it remained in force and unrevoked it was a continuing offer during the time limited for acceptance, and during the whole of that time it was an offer every instant; but as soon as it was accepted it ceased to be an offer merely, and then ripened into a contract."

The case of *Davidson & Case Lumber Co.* v. *Motter*, 14 Fed. (2d) 137, was an income and profits-tax case and involved the question of in what year a sale was made. The facts are stated in the opinion, where the court said:

II. We come now to the sale of real estate by the corporation. Was this sale for the purpose of assessing income or profit taxes under the act of 1918 made in the year 1919 or the year 1920?

A contract of sale by the corporation of certain real estate on which it had operated a lumber yard was made to solvent purchasers, able to pay at any time, on November 20, 1919. At that time $10,000 was paid in cash and a contract in writing was entered into between the corporation and the purchasers, conditioned alone on the title being found satisfactory to the purchasers. Some time in the month of December, 1919, the purchasers, having examined the title, removed this condition from the contract by advising the corporation the title to the property was satisfactory to them, and the contract of sale was thus made absolute. The contract provided for the payment of the remainder of the purchase price, $100,000, on June 1, 1920, and that conveyance should be delivered by the corporation to the purchasers at this time. Also the corporation, not being able to remove its business from the property, agreed to pay one-half the taxes for the year 1920 as a consideration for being permitted to remain on the premises. However, the dominion, control, burdens, and benefits of the property were passed to the purchasers in the year 1919 at the time the contract of sale was made absolute. The Revenue Act provides, in regard to the assessment of property under such conditions, as follows:

" Sec. 213 (a) That for the purposes of this title * * * the term 'gross income' includes gains, profits, and income derived from * * * sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property." Comp. St. Ann. Supp. 1919, § 6336 ⅛ ff.

The question is, who owned this property in the latter days of the year 1919? As the right of the corporation to compel compliance with the terms of the contract was by the contract made dependent on the corporation delivering a good title to the purchaser, the contract remained conditional and dependent until the title had been examined and approved by the purchasers. As the corporation was notified this condition was met in the month of December, 1919, thereafter the conditional contract of sale became absolute in its terms, and any loss to the property or any benefits or advantage accruing thereto was the loss or benefit of the purchasers. To this end come not only the adjudicated cases on the question but the very reason of the thing itself. The Supreme Court of this state in *Gordon* v. *Munn*, 87 Kan. 624, 125 P. I., Ann. Cas. 1914 A. 783, said:

" The purchaser of land in possession under an agreement for a conveyance is considered the owner in equity, subject to the payment of the purchase money, and the vendor is treated as the trustee of the legal title. * * * The fact that possession was not transferred in this instance may be accounted for by the relationship of the parties. "

\*       \*       \*       \*       \*       \*       \*

As the contract for the sale of the property, fixing the terms of the sale made, the amount of the purchase price to be paid, and all other of its terms, including the present payment of $10,000, was performed in the year 1919, the amount of profits taxable must have been determined as of that year as readily and absolutely as of the date the conveyance was delivered and the deferred payment made. I therefore find as a fact the sale of the real estate in this case, while not perfected by conveyance and full payment of the purchase price until June, 1920, was made in the year 1919, as contended by the plaintiff in this case, and that the profit made in the transaction should have been included in the income and excess profits taxes of the corporation for the year 1919.

In *H. F. McCreery*, 4 B. T. A. 967, a sale of the taxpayer's interest in a partnership was agreed upon in 1919, but the price to be paid was not finally settled until 1921 and it was held that the sale was made in 1919. The Board said:

The last issue to be considered concerns the Commissioner's action in holding that the sale of the partnership's assets and businesses constituted a completed transaction for the year 1919, and that any gain or loss realized therefrom should be reflected in the partnership net income for that year. The petitioners contend that since there was no determination within the year 1919 of the actual amount to be paid by the purchaser for the partnership assets and businesses, and that final payment was not made by the purchaser until December, 1921, the sale was not completed until the year 1921, and any gain or loss resulting therefrom should be reflected in the partnership net income for the latter year. The books of the partnership were maintained upon the accrual basis. According to the terms of the sale contract, the purchaser, on May 1, 1919, took possession of the business and of all offices, and thereafter the partners conducted the businesses for the account of the purchaser. The transaction was completed so far as the partnership was concerned and, in the event of the purchaser's failure to make payment according to the terms of the contract, the partnership could not have repossessed the properties, but would have been limited to an action to enforce payment under the contract to pay. It appears that it was not until some time later than the year 1919 that the specific amount to be paid by the purchaser for the partnership assets and businesses was determined. But, all circumstances considered, we do not think this fact sufficient to justify the postponement until a later year of the accounting for the gain or loss realized from the sale. The sale was consummated in the year 1919; the liability of the purchaser to pay the purchase price arose in that year; and, in our opinion, whatever gain or loss resulted from the sale accrued to the partnership in the same year. * * *

A similar case is *Parish-Watson Co.*, 2 B. T. A. 851, where the Board said:

The second question presented is whether the profits arising from the sale of certain art objects to one Morton F. Plant, as set forth in the findings of fact, were income to the taxpayer in the year 1918 or in the year 1919. The Commissioner contends that they were income for the year 1918. In its petition the taxpayer raised the point that the sale was one on the installment plan and that the profits arising therefrom should be allocated to the several payments. It abandoned that contention, however, at the hearing. It reported the profits in question as income for the year 1919 and now contends that

they were in fact income for that year. The amount of the profits involved is conceded to have been $61,268.75.

We are of the opinion, upon consideration of the evidence presented, that the position of the Commissioner as to this point is correct and should be approved. The transaction was clearly a sale of merchandise in the year 1918. The art objects were delivered to Plant and the terms of purchase were communicated to him in writing. On May 8, 1918, he wrote to the taxpayer that " I beg hereby to confirm the purchase," and contracted to pay certain amounts of money at certain specified dates in accordance with the proposition made to him by the taxpayer. The transaction was completed so far as the taxpayer was concerned, and, in the event of Plant's failure to make payment, as set forth in his letter of May 8, 1918, the taxpayer could not have repossessed the art objects, but would have been limited to an action to enforce payment under the contract to pay. The transaction was a completed sale in the year 1918, and, as the taxpayer kept its books of account on the accrual basis, the sale price was properly accruable in that year. We hold, therefore, that the profits arising from the sale in question were income to the taxpayer in the year 1918.

In the instant case Bailey received $1,000 on account of the signing of the original contract November 26, 1921, and from that date had nothing more to do with the management or conduct of the business. He stepped out and so far as was necessary Trimble, the purchaser, stepped in. Collins, the remaining partner, ran the business and frequently consulted Trimble prior to January 1, 1922, as to its policy and Trimble obligated himself to the extent of $50,000 on bank paper of the firm, which, had there been no sale, Bailey would have had to assume. It seems to us that no matter whether we consider the original contract and succeeding negotiations a sale, an agreement for a sale, an option, or an offer, that the sale was complete when Bailey wrote Trimble on December 31, 1921, that the redrafted contract was satisfactory and had Collins telegraph Trimble to the same effect and at the same time drew on Trimble for $24,000 as per their agreement. This draft was to all intents and purposes cashed by Collins and over $700 of the proceeds were used that day to extinguish Bailey's debt to his old firm. It was the purpose of all the parties to close the transaction as of December 31, 1921, and the action of Bailey constituted a mutual assent and a binding contract of sale prior to the signing of the final papers on January 5, 1922. Bailey had no interest of any kind after December 31, 1921. The reference by Bailey in his acceptance to the time he was to remain out of competitive business was not a part of the original contract and was not in the final contract. It was a part of a supplemental agreement and formed no part of the contract of sale and was no real dissent in the light of Bailey's other acts. The only difference between the original contract of November 26, 1921, and the final one of January 5, 1922, was the elimination of the laundry stock from the consideration, and the purpose of the supplemental contract was to put it back again under certain conditions.

The signing of the papers and delivery of the note on January 5, 1922, was merely the formal execution and reduction to written evidence of the terms of the sale made in 1921, and which had been carried out to the extent of Bailey's retirement from the business November 26, 1921, and his collection of $24,000 on account of the purchase price, on the same day he wrote Trimble the contracts were " O. K." *Old Farmers' Oil Co.*, 12 B. T. A. 203; *Pacheco Creek Orchard Co.*, 12 B. T. A. 1358.

It remains to consider the amount of the initial payment, which is the sum of all payments made during the taxable period in which the sale was made. The original agreement of November 26, 1921, provided for the payment of $1,000 on the purchase price and was paid upon the signing of the agreement. It was further provided in the agreement that, in the event that Trimble was unable to carry out his part of the agreement, Bailey should retain the $1,000 as liquidated damages. There was no provision of any kind for the return of the $1,000 to Trimble in any event or upon any condition. Upon its payment to Bailey it became his absolute property on one ground or the other and was a payment made in 1921. Cf. *John Derschug*, 15 B. T. A. 306. By agreement of the parties, Bailey was to collect and be paid $24,000 by draft on December 31, 1921, and this was to be considered as cash. To all intents and purposes, it was cash and practically the same as if Trimble had sent Bailey his check and Bailey had deposited the check as a cash item in bank and had not checked it out for several days after. We consider the payment of $24,000 to have been made and received December 31, 1921.

The Board had a somewhat similar question before it in *John Griffiths*, 15 B. T. A. 252, where the stockholders of a large contracting firm agreed that, instead of having surety companies go on the company's contract bonds, they would go on the bonds in their individual capacities and divide the premiums they would have had to pay a bonding company. The premiums were divided according to their stockholdings and were credited on the books when the bonds were given, but in the case of John Griffiths were not collected in cash until a subsequent year. The question was whether they were taxable in the year when credited, or in that in which received in cash. The Board held they were taxable in the year when credited. The Board said:

There is no testimony, however, to the effect that the petitioner did not consider the amounts taxable because they were not received in cash.

On the other hand, the theory of the petitioner's case is that the amounts were taxable before received in cash and it is not contended that he should have waited until he withdrew the cash before reporting them in his income.

Under the evidence he clearly could have received the entire amount in cash in 1919 if he had desired. All that he had to do was to take it.

So in this proceeding all Bailey had to do was to ask for it and the actual cash or a check would have been given him on December 31, 1921. *John A. Brander*, 3 B. T. A. 231.

In *Albert J. Sullivan*, 16 B. T. A. 1347, the Board held that interest credited to the personal account of petitioner on the books of the corporation of which he was a stockholder was constructively received where the financial condition of the debtor during the taxable years was such that the amounts credited could have been paid.

In *Marian Otis Chandler*, 16 B. T. A. 1248, a number of cases are reviewed and the deduction drawn that, if the funds are available, subject to demand of taxpayer, and debtor is able to pay, and taxpayer merely omits to take possession of what is his, this constitutes a receipt of taxable income.

It results that the sale was made in 1921, that the initial payment during that year was $25,000 which is less than one-fourth of the purchase price of $200,000, and that the sale was an installment sale and petitioners' income therefrom should be computed on the installment basis.

*Judgment will be entered under Rule 50.*