*768 OPINION.
Van Fossan :
In order to determine whether or not the transaction between the decedent and H. D. Walbridge & Company was an installment sale, as alleged by the petitioner in his first assignment of error, we must look to the contract of November 16, 1923, and also to the acts of the parties performed thereunder and subsequent thereto. The petitioner claims that the facts of this case bring it within the provisions of section 212 (d) of the Revenue Act of 1926, *769 retroactively applied by section 1208 thereof. Section 212 (d) is as follows:
Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the total profit realized or to be realized when the payment is completed, bears to the total contract price. In the case (1) of a casual sale or other casual disposition of personal property for a price exceeding $1,000, or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed one-fourth of the purchase price, the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this subdivision. As used in this subdivision the term “ initial payments ” means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.
The relevant portion of article 42, Regulations 65, is as follows:
In the case of a casual sale or other casual disposition of personal property for a price exceeding $1,000, income may be returned on the installment basis provided the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable year in which the sale or other disposition is made do not exceed one-fourth of the purchase price.
The petitioner asserts that the payment of $25,000 made on December 8, 1923, was the “ initial payment,” was less than one-fourth of the purchase price, and that the transaction was a “ casual sale or other casual disposition of personal property for a price exceeding $1,000.” The respondent maintains that the sale of capital stock by the decedent to Walbridge & Company was made in 1924, that the initial payment was $262,000, or approximately one-third of the purchase price, and that the contract of November 16, 1923 (known as Exhibit A), was merely an agreement to sell the stock contingent upon certain events which occurred in 1924 and which served as a basis for completing the sale and transferring the title to the purchaser or its designee.
We believe that the respondent has correctly construed the contract. The decedent, called the seller, undertook to secure for the buyer all of the shares of stock in the Warren and Jamestown companies. He agreed that he would obtain at least 75 per cent of the capital stock of those companies and all of the outstanding shares of capital stock of the four electric power companies, together with the resignations of officers and directors of all such companies within ten days of the date of contract, and deposit them with the depositary. While the dates of the options for the purchase of this stock of the Warren and Jamestown companies are not shown in the record, yet, judging from the subsequent payments made to the stockholders, we may infer that the seller had *770 secured practically all, if not all, of those options prior to November 16, 1923. It is presumed that the resignations were secured in due course as shown by the letter of the seller dated November 30, 1923, and directed to the depositary. We note that the options provided that the original owners of the stock should deposit it in escrow with the depositary, with the forms of assignment and power of attorney duly executed by the owners. Thus the physical possession of the certificates of stock was assured when and if they should be required to complete the transaction.
A careful study of the agreement of November 16, 1923, discloses that it was executed for the purpose of effecting the sale and transfer of the controlling interest in the capital stock of the Warren and Jamestown companies and the electric power companies if, and. when, the stock should be secured by the seller and could be legally sold to the purchaser and the resignations of the officers and directors of the several companies duly obtained. Paragraph six of the agreement states that the buyer intended to sell to the Penn Public Service Corporation without variation in price the stock purchased from the seller and “ consequently the purchase * * * by the buyer is subject to the approval of the Public Service Commission of Pennsylvania and of the Public Service Commission of the State of. New York.” ’ Thus the agreement recognizes that the sale was contingent upon such approval and that it could not be consummated without it. The pertinent statutes relating to the action by the public service commissions are as follows:
Acquisition of control of another public service company. — To purchase, acquire, take or hold, either in absolute ownership or in pledge, or as collateral security, directly or indirectly, any controlling right, title, or interest, legal or equitable, in the capital stock, bonds, trust certificates, or other evidences of indebtedness or other securities, issued by, or other controlling right, title, or interest whatsoever in, any other public service company, conducting business within this Commonwealth, without the consent and approval of the commission ; but the purchase, taking and holding, aforesaid, of any right, title, or interest in any such capital stock, bonds, trust certificates, or other evidences of indebtedness or other securities, or of any other right, title, or interest in any other public service company, which shall amount to less than the aforesaid controlling right, title, or interest, of any nature or kind, shall be lawful without the approval of the commission, * * (Paragraph 18097 of the Pennsylvania Statute Law 1920.)
No railroad corporation, street railroad corporation, or electrical corporation, domestic or foreign, shall hereafter purchase or acquire, take or hold, any part of the capital stock of any railroad corporation or street railroad corporation or other common carrier organized or existing under or by virtue of the laws of this state, unless authorized so to do by the commission empowered by this act to give such consent; and save where stock shall be transferred or held for the purpose of collateral security only with the consent of the commission empowered by this chapter to give such consent, *771 * * *. Every contract, assignment, transfer or agreement for transfer of any stock by or through any person or corporation to any corporation, in violation of any provision of this chapter, shall be void and of no effect, and no such transfer or assignment shall be made upon the books of any such railroad. corporation or street railroad corporation, or shall be recognized as effective for any purpose. The power conferred by this section to approve or disapprove a transaction relating to franchises, rights or stock of any railroad corporation or street railroad corporation, or other common carrier, shall be exercised by the commission which is authorized by this act to approve the issue of stock by such railroad corporation or street railroad corporation. (Chapter 49, paragraph 54, of Cahills Consolidated Laws of New York, 1923.)
The dates of approval by the public service commissions are uncertain, but under paragraph seven of the agreement of November 16, 1923, “the final settlement must be within thirty days after such approval.” The stock certificates were assigned to the Venango Public Service Corporation on about April 10, 1924, payments, either partial or in full, were made to the stockholders on that date, and the payment of $237,000 was made by the buyer to the seller at that time. Consequently we may accept April 10, 1924, as the date of the “ final settlement ” which was described in and contemplated by the agreement as completing the sale and transfer of the stock.
The $25,000 payment made into the depositary on December 3, 1923, was for the purpose of evidencing the good faith of the buyer. Various provisions were made for the return of that amount if the sale should not be consummated or if some of the provisions of the agreement could not be carried out by either the seller or the buyer. In the event that both parties could accomplish the purpose of the agreement that amount was to be considered as an advance payment under the contract. It was a portion of the customary “ one-third cash ” payment. It might also be considered as a “ binder,” since the agreement of November 16, 1923, while under seal, is without specific consideration.
We also note that under the agreement of November 16, 1923, the sale originally was to be for cash, but that the buyer was given the option to complete the payment by tendering its serial note of the Venango Public Service Corporation endorsed by the buyer and collaterally secured by the certificates of stock of the Warren and Jamestown companies and the Carroll Electric Light & Power Company. The buyer chose to make settlement in that manner.
The petitioner relies upon the case of B. P. Bailey et al., 18 B. T. A. 105. In that case Bailey, a member of an insurance agency firm, sold his interest to one Trimble. The agreement was made and the transaction completed in 1921 and Trimble assumed the position and status formerly held by Bailey. He participated in the management and conduct of the business. In the year 1922 the formal agreement of sale was executed and a supplemental agreement was *772 entered into and certain details of the transfer were accomplished. In that case the liability of the purchaser to pay arose in 1921. In the case at bar it arose in 1924. In the Bailey case there was no provision for the return of that portion of the purchase price paid in 1921. In the case at bar provision was made for the return of $25,000 under certain contingencies. We are of the opinion that the Bailey case does not affect our decision in this proceeding.
In view of the fact that the payment of $237,000 made on April 10, 1924, together with the advance payment of $25,000, constituted approximately one-third of the total purchase price, it is obvious that section 212 (d) above mentioned does not apply and the profit derived from the sale can not be taxed on the installment basis.
The second issue relates to the assertion of the petitioner that the transaction constituted a “ short sale,” in that the decedent entered into a contract to sell something which he did not own. What is commonly known as a short sale is well described in S. M. 1179, 1 C. B. 60, as follows:
A sells to B 100 shares of stock, executing a memorandum of sale. Under the rules of the exchange the shares have to be delivered and paid for the day following. If the sale is a short sale A applies to C, who has such shares on hand, for a “ loan ” of them. C being willing to lend them,’ delivers to A a certificate for 100 shares indorsed in blank on A’s agreement to redeliver to him an equivalent number of shares on demand on any business day and the deposit with C by A of the market value of the shares as security for their return. That deposit remains until an equal number of shares are returned, subject to increase from day to day if the market value of the stock rises, and to decrease from day to day if the market value of the stock falls. A makes his delivery under his transaction with B by delivering the certificate which he has borrowed from C for that purpose, thereby completing the transaction between A and B. When A desires to return the shares which he has “ borrowed,” A goes into the market and buys 100 shares for the purpose of delivering them to O. These shares acquired for delivery to O he delivers to O and receives the amount he has on deposit with O.
The transaction under consideration does not possess the characteristics included in the above definition. The decedent had secured options on all the stock which he had agreed to sell to Walbridge & Company. Not only that, he also had taken the precaution to have the certificates of stock placed in the possession of the depositary ready for immediate delivery upon the payment of the price named in the option. There was no necessity for him to “ borrow ” stock. There remained for him only the right to exercise the option and to obtain the stock for delivery to the buyer. That the decedent was able to and did do that thing is shown by the fact that the options were exercised, payments made and the certificates of stock transferred on April 10, 1924. Furthermore, the decedent paid the original stockholders in cash and his own obligations, thereby releasing the stock for the purpose of transfer to the Venango Public *773 Service Corporation. That company in turn pledged the same stock as collateral security for its note to the seller. The facts in this case, therefore, are not similar to those set forth in A. F. Osterloh, 13 B. T. A. 713, cited by the petitioner in support of its contention.
The third allegation of error was disposed of by our decision on the first issue.
The petitioner asserts that because of the fact that the decedent’s return was made on the cash receipts and disbursements basis the profit on this transaction should be taxed as the stock was paid for by the decedent. We have held that the sale of the stock specified in the agreement of November 16, 1923, was made on April 10, 1924. At that time the decedent paid cash for some of the shares and part cash in consideration of the purchase of other stock. In the stipulation of facts appears this statement: “ Decedent paid for said stock under the terms of the contract referred to as petitioner’s Exhibit C, and the exact dates of payment are shown by petitioner’s Exhibit D.” This statement can not be entirely accurate since Exhibit C merely substitutes a new paragraph relating to the method of securing payment of the deferred portions of the purchase money. The other terms of the option remain as set forth in Exhibit B. The facts as stipulated are confined to the payments made on the options, their amounts and the dates thereof, but we are without information as to whether or not the decedent actually deposited with the depositary a certificate or declaration of trust showing the beneficial interest of the optionor in any note the decedent might receive from the seller. Exhibit C merely gave the decedent the option of depositing such a certificate in lieu of his own promissory notes. We do not know that he exercised that option.
On April 10,1924, the decedent sold to Walbridge & Company the stock described in the agreement of November 16, 1923, for the sum of $787,375. In payment therefor he received $262,000 in cash and the note of the Venango Public Service Corporation in the amount of $525,375, endorsed by Walbridge & Company, bearing interest at 6 per cent, payable in four equal installments of $131,343.75, in four, eight, twelve, and sixteen months, respectively, from date, and further secured by the assignment of 7,495 shares of the Warren company’s stock, 1,989 shares of the Jamestown company’s stock, and 20 shares of the Carroll Electric Light & Power Company stock as collateral. So far as the record discloses, there was no encumbrance against that stock. It was properly assigned as collateral and could have been subjected to sale in the event that the note of the Venange Corporation had not been paid. We have no evidence to show that the stock was not worth its sale price. The Venango Corporation note was endorsed by Walbridge & Company, presumed to be a solvent concern, and the unpaid purchase obligation was approxi *774 mately two-thirds of the ostensible value of the stock. Under these circumstances we are of the opinion that the fair market value of the Venango Corporation note on April 10, 1924, was its full face value.
The sale on April 10, 1924, was a closed transaction for cash and its equivalent. The profit accruing from it was realized on that date and should be taxed in the year 1924.
What we have just said disposes of the fifth and sixth allegations of error. In view of our decision above, article 39 of Regulations 65 is not applicable and that issue automatically is decided in favor of the respondent.

Decision will be entered for the respondent.